```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA


BRADLEY GOOD et al.,                :    CIVIL ACTION
                                    :    No. 14-4295
     Plaintiffs,                    :
                                    :
     v.                             :
                                    :
NATIONWIDE CREDIT, INC.,            :
                                    :
     Defendant.                     :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                              October 5, 2015

      Plaintiffs Bradley Good and Edward Soucek, on behalf of a putative class, and Defendant Nationwide Credit, Inc., have negotiated and agreed to a class action settlement that will resolve the instant matter, which involves allegations that Defendant mailed Plaintiffs and others collection notices including language that is false, deceptive, or misleading under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692o.

      On July 9, 2015, Plaintiffs filed an unopposed motion for an order (1) granting preliminary approval of the proposed settlement agreement; (2) granting preliminary certification of a settlement class; (3) appointing class representatives and

class counsel; (4) approving the dissemination of a proposed form of class notice; and (5) scheduling a fairness hearing.

The issue before the Court is whether it may approve a settlement agreement between a putative class and a debt collector defendant in an action under the FDCPA, where the total amount to be distributed to the class exceeds the statutory cap of the lesser of $500,000 or one percent of the net worth of the debt collector defendant, 15 U.S.C. § 1692k(a)(2)(B). The answer is no.

## I.   BACKGROUND

### A.   Factual Background and Procedural History

On September 9, 2013, Defendant, a debt collection service, sent Plaintiff Soucek a dunning letter on behalf of creditor GE Capital Retail Bank offering to settle his account for less than the amount owed. See Compl. Ex. A (ECF No. 1). The letter included the following language: "GE CAPITAL RETAIL BANK is required to file a form 1099C with the Internal Revenue Service for any cancelled debt of $600 or more. Please consult your tax advisor concerning any tax questions." Id. On December 10, 2013, Defendant sent Plaintiff Good a similar letter on behalf of creditor American Express. See Compl. Ex. B. The letter included the following language: "American Express is required to file a form 1099C with the Internal Revenue Service

for any cancelled debt of $600 or more. Please consult your tax advisor concerning any tax questions." Id.

In their Complaint filed on July 16, 2014, Plaintiffs claim that this language is false and misleading and constitutes a "collection ploy" in violation of the FDCPA. Id. ¶¶ 24, 26, 36. Within the Complaint, Plaintiffs include a "Class Allegations" section, proposing a class comprised of "[a]ll persons with addresses in the Commonwealth of Pennsylvania . . . who were sent one or more collection letter(s) from Defendant" that included the challenged statement or a "substantially identical statement." Id. ¶ 28.

Defendant filed a motion to dismiss on September 5, 2014 (ECF No. 8), which this Court denied on October 27, 2014 (ECF No. 21). In the accompanying memorandum, the Court found that the challenged statement concerning Internal Revenue Service ("IRS") reporting requirements failed to accurately reflect controlling law, at least in some respects; could be seen as deceptive and misleading under the least sophisticated debtor standard, which the Third Circuit applies to FDCPA claims such as those brought in this action; and that the challenged statement was material. See generally ECF No. 20.

Through discovery, Plaintiffs learned that Defendant sent collection letters containing the challenged statement on

behalf of two of its clients, GE Capital Bank[1] and American Express, from September 2012 to July 2015. See Pls.' Mot. 4. Defendant mailed such letters to approximately 15,225 Pennsylvania consumers in the period from July 15, 2013, to July 1, 2015.[2] Id.

In May 2015, the parties informed the Court that they had reached a class-wide settlement in principle. On July 9, 2015, Plaintiffs filed the instant uncontested motion for entry of an order preliminarily granting class certification and approving the proposed settlement. ECF No. 37. A hearing on Plaintiffs' motion was held on August 28, 2015.

B. The Proposed Class Action Settlement

The terms of the proposed class action settlement are set forth in the Class Action Settlement Agreement, Pls.' Mot. Ex. 1 ("Settlement Agreement"), and are outlined below.

---

[1] GE Capital Retail Bank changed its name to Synchrony Bank in June 2014. Pls.' Mot. 3 n.1.

[2] While not specifically explained in the instant motion, Plaintiffs presumably limited the proposed class to those who received collection letters containing the suspect language within one year from the date of filing of the Complaint, because the statute of limitations for bringing a claim under the FDCPA is one year from the date on which the violation occurs. 15 U.S.C. § 1692k(d). Pennsylvania consumers who received letters after the Complaint was filed are also included in the proposed class. Pls.' Mot. 4. An affidavit by Defendant's corporate representative attaches a list of all 15,225 putative class members. See Pls.' Mot. Ex. 6, Rico Aff. ¶ 2.

### 1. The Proposed Settlement Class

The Settlement Agreement provides for a settlement class defined as follows:

> All persons with addresses in the Commonwealth of Pennsylvania[] who were sent one or more collection letters from NCI[] that stated GE Capital Retail Bank, Synchrony Bank, or American Express "is required to file a form 1099C with the Internal Revenue Service for any cancelled debt of $600 or more," or a substantially identical statement[,] where the underlying debt being collected was incurred primarily for personal, family or household use; the letter(s) bear(s) a send date from July 16, 2013 through July 1, 2015; and the letter(s) were not returned as undeliverable.

Pls.' Mot. Ex. 1 ¶ 1(B). Plaintiffs represent that the class will include approximately 15,225 individuals. Pls.' Mot. 2.

### 2. The Proposed Settlement

The Settlement Agreement provides that Defendant will deposit $257,000 with a class administrator to create the settlement fund. Id. ¶ 16(A). This fund will then be distributed by the class administrator in equal shares to each of the class members who have not opted out of the class and whose class notice is not returned as undeliverable and without a forwarding address. Id. Thus, each class member will receive at least $16.89, and possibly more if some class members opt out or some class notices are returned as undeliverable. Settlement checks will be mailed automatically to class members no later than

5

twenty days after the final judgment date; class members need not take any action, such as filing a claim form, to receive payment. Id. ¶ 16(B); Pls.' Mot. 17. While the original settlement agreement provided that half of any unclaimed funds would be awarded to Legal Aid of Southeastern Pennsylvania and half to Mid-Penn Legal Services as a cy pres remedy, the parties have since revised the Settlement Agreement to allow the Court to determine the recipient, or recipients, of the cy pres fund once distribution to the class has been completed. Pls.' Mot. Ex. 1 ¶ 16(C); Consent Order Suppl. Pls.' Mot. Ex. B.

Second, Defendant will pay the class representatives, Plaintiffs Good and Soucek, a settlement for their individual FDCPA claims in the amount of $1,000 each. Pls.' Mot. Ex. 1 ¶ 16(D). In addition, Defendant will pay the class representatives a service award of $1,000 each. Id. These payments, $4,000 in total, are in addition to and separate and apart from the class settlement fund. Id.

Third, Defendant will pay class counsel approved reasonable attorneys' fees and litigation expenses in an amount not to exceed $125,000. Id. ¶ 17. As with the payments to the class representatives, the payment of attorneys' fees and expenses is in addition to and separate and apart from the amount that Defendant will pay to the class. Id. Defendant will

also pay the costs of class notice and administration of the settlement. Id. ¶ 6.

In exchange for the benefits provided in the Settlement Agreement, settlement class members agree to release any and all claims that they may have against Defendant Nationwide Credit, Inc., and Defendant's clients, American Express Company, GE Capital Retail Bank, and Synchrony Bank, on whose behalf it sent dunning letters, as well as their privies, in connection with the challenged language in collection letters mailed by Defendant. Id. ¶¶ 1(F)-(G), 15.

## II. DISCUSSION

Under Federal Rule of Civil Procedure 23(e), the settlement of a class action requires court approval. See Fed. R. Civ. P. 23(e)(2). A district court may approve a settlement agreement "only after a hearing and on finding that it is fair, reasonable, and adequate." Id. When presented with a class settlement agreement, the court must first determine that the requirements for class certification under Rule 23(a) and (b) are met and then separately determine that the settlement is fair to the class under Rule 23(e). In re Nat'l Football League Players Concussion Injury Litig., 775 F.3d 570, 581 (3d Cir. 2014); Sullivan v. DB Invs., Inc., 667 F.3d 273, 319 (3d Cir.

2011) (citing In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 257 (3d Cir. 2009)).

It appears, at least upon preliminary review, that the requirements of Rule 23(a) and (b)(3) are satisfied and that a settlement class could be preliminarily certified. Therefore, the Court must then determine whether the proposed settlement is "fair, reasonable, and adequate" as required by Rule 23(e)(2). In re Prudential Ins. Co. Am. Sales Practice Litig., 148 F.3d 283, 316-17 (3d Cir. 1998). Although ordinarily such inquiry explores the terms of the proposed settlement agreement from the point of view of the benefits provided to the class, the issue here is whether the voluntary settlement reached by the parties is lawful and therefore can receive court approval.

    A.    <u>The Proposed Settlement Fund Violates Congressional Intent in Setting a Statutory Cap on Damages in FDCPA Class Actions</u>

The FDCPA's civil liability provision provides as follows:

> **(a)** **Amount of damages** Except as otherwise provided by this section, any debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of--
>
> > (1) any actual damage sustained by such person as a result of such failure;

> (2)(A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; or
>
> (B) <u>in the case of a class action, (i) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector</u>; and
>
> (3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. On a finding by the court that an action under this section was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs.

15 U.S.C. § 1692k(a) (emphasis added). The statute therefore provides for "additional damages" in "such amount as the court may allow for all other class members," 15 U.S.C. § 1692k(a)(2)(A-B), and goes on to list several factors[3] a court is to consider when determining the defendant's liability with respect to those "additional damages."

---

[3] In determining the defendant's liability for "additional damages" in an FDCPA class action, "the court shall consider, among other relevant factors . . . the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, the resources of the debt collector, the number of persons adversely affected, and the extent to which the debt collector's noncompliance was intentional." 15 U.S.C. §1692k(b)(2).

Determining what Congress meant by "additional damages" that may be awarded to the class presents a question of statutory interpretation. In interpreting a statute, the "polestar . . . must be the intent of Congress, and the guiding lights are the language, structure, and legislative history" of the statute. Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris, 463 U.S. 1073, 1108 (1983) (O'Connor, J., concurring). This Court therefore begins with the language in the statute.

Where the statutory language at issue is plain, a court "must enforce it according to its terms." King v. Burwell, 135 S. Ct. 2480, 2489 (2015) (citing Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242, 251 (2010)); see also In re Phila. Newspapers, LLC, 599 F.3d 298, 304 (3d Cir. 2010) ("It is the cardinal canon of statutory interpretation that a court must begin with the statutory language. '[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then this first canon is also the last: judicial inquiry is complete.'" (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992))). "A provision is ambiguous only where the disputed language is 'reasonably susceptible of different interpretations.'" Phila. Newspapers, 559 F.3d at 304 (quoting Dobrek v. Phelan, 419 F.3d 259, 264 (3d Cir. 2005)).

The class action "additional damages" provision at issue here, 15 U.S.C. § 1692k(a)(2)(B), is ambiguous, because it does not indicate whether it applies only to an amount obtained by the class after adjudication (such as after a jury trial or non-jury bench trial) or whether it also applies to an amount distributed to the class as a result of a settlement agreement.

Where a statutory provision is ambiguous as to a certain issue, the court must look to the provision's placement within the larger statutory scheme, the statute's purpose, and its legislative history to discern its meaning. King, 135 S. Ct. at 2489, 2492-93. If so, a court's "duty, after all, is 'to construe statutes, not isolated provisions.'" Id. at 2489 (quoting Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 290 (2010)). And a court "cannot interpret federal statutes to negate their own stated purposes." N.Y. State Dept. of Soc. Servs. v. Dublino, 413 U.S. 405, 419-20 (1973). Thus, the Court turns to legislative history.

The FDCPA's class action damages provision--now codified at 15 U.S.C. § 1692k(a)(2)(B)--appeared in the original bill as enacted by Congress in 1977. See 95 H.R. 5294, 95th Cong. (1977). While the legislative history in connection with this particular provision is not pellucid, it is sufficiently clear that the Act, as a whole, emerged as a result of certain

11

compromises between consumer protection proponents and the debt collection industry.[4] According to the Senate Report concerning the Act, the FDCPA's "purpose is to protect consumers from a host of unfair, harassing, and deceptive debt collection practices without imposing unnecessary restrictions on ethical debt collectors." S. Rep. No. 95-382, at 1 (1977). A House Report similarly notes that the targets of the statute, independent debt collectors, "constitute an industry separate from creditors," where creditors are "usually larger and more stable." H. Rep. No. 95-131, at 7 (1977). These "small debt collection agencies . . . can easily go out of business after suit by the [Federal Trade] Commission" or private parties. Id. Accordingly, drafters aimed for a bill that would "not only curb abuse and protect our citizens, but w[ould] also allow the survival of a necessary industry." Id.; see also id. at 26 (statement of Rep. Dave Evans) (calling the bill "a compromise bill between trying to prohibit abusive and harassing practices by debt collectors, while limiting federal government interference in the independent and basic functions of debt collection agencies"); id. at 30 (statement of Hon. Edward W.

---

[4]   The German chancellor Otto von Bismarck, in referring to the legislative process, is reported to have said, "If you like laws and sausages, you should never watch either one being made." See, e.g., Robert Pear, If Only Laws Were Like Sausages, N.Y. Times (Dec. 4, 2010), http://www.nytimes.com/2010/12/05/weekinreview/05pear.html?_r=0 (attributing this statement to Otto von Bismarck).

12

Patterson) (recognizing that "the major debt collection associations have withdrawn their active objections to this bill as a result of the removal of many of its provisions they considered oppressive").

Earlier versions of the Act contained a class action damages cap of $100,000 or one percent of the debt collector's net worth, whereas later versions set the dollar limit at $500,000 while retaining the one-percent limitation. See Fair Debt Collection Practices Act Hearing Before the Subcomm. on Consumer Affairs of the S. Comm. on Banking, Hous., & Urban Affairs, 95th Cong. 106 (1977) (statement of Kathleen P. O'Reilly, Executive Director, Consumer Federation of America) (explaining these differences). Ultimately, however, the higher dollar limit was selected, presumably to provide greater deterrence. See id. (arguing that "[a] higher dollar limit is needed for the legislation to have a more significant deterrent effect on large debt collectors"); see also Debt Collection Practices Act Hearing Before the H. Comm. on Banking, Currency & Hous., Subcomm. on Consumer Affairs, 94th Cong. 233 (1976) (statement of Jay I. Ashman, Assistant Att'y Gen., State of Vermont) (expressing concern that "a debt collection agency may be run on a shoestring" and that "[l]imiting the collector's liability to a percent of its net worth would in many cases eliminate the class action as a viable consumer remedy").

13

Based on its analysis of the FDCPA's legislative history, one circuit court has found that the "primary purpose of the net worth provision is a protective one[,] . . . ensur[ing] that defendants are not forced to liquidate their companies in order to satisfy an award of punitive damages." Sanders v. Jackson, 209 F.3d 998, 1002 (7th Cir. 2000) (determining that the term "net worth" in the FDCPA's class damages provision refers to a debt collector's book value net worth, or balance sheet net worth, rather than its fair market net worth and thus does not include the debt collector's goodwill). Therefore, "the 1% of net worth limitation was designed to identify that portion of a company's assets which safely could be liquidated to satisfy an award of damages without forcing the breakup of that company" and to ensure "that de minimis violations [w]ould not be punished with such severity that the companies are deprived of existence." Id.

While there was initially some disagreement between the parties in this case as to how to measure and the appropriate time at which to measure Defendant's net worth, the parties now agree that Defendant's 2014 net worth of $19.7 million reflects its highest possible valuation. Pls.' Mot. 5. Thus, one percent of $19.7 million, or $197,000, represents the putative class's maximum possible damages award under the FDCPA, regardless of the number of members in the class. Id.

14

Here, under the terms of the Settlement Agreement, however, Defendant is to pay a sum of $257,000 to the class--$60,000, or roughly thirty percent, above the statutory ceiling. Id. Plaintiffs represent that "[n]o actual damages were sought in this case," as may have been provided under 15 U.S.C. § 1692k(a)(1), and Plaintiffs do not provide another plausible explanation for why the additional $60,000 above the statutory cap is warranted.[5] Therefore, it appears that the value of the settlement fund is based entirely on the "additional damages" available to the class under 15 U.S.C. §1692(k)(a)(2)(B).

The Court will reject the proffered Settlement Agreement, because the settlement fund made available to the class subverts Congress's directive in setting a cap on class damages in § 1692k(a)(2)(B). The Court does not believe that Congress intended for the statutory damages cap to apply only to awards obtained after trial, and not to settlements, particularly when a substantial number--if not the majority--of

---

[5] At the hearing, Plaintiffs' counsel suggested that Defendant agreed to pay the additional $60,000 in exchange for Plaintiffs' counsel's agreement--after an initial settlement agreement had been reached by the parties--to amend the definition of the putative class to include persons who received letters containing language at issue after the Complaint in this matter was filed, thereby increasing the size of the class by approximately 5,000 members. The FDCPA, however, does not make application of the statutory damages cap dependent on size of the class.

FDCPA class actions are resolved through settlement.[6] And, of course, it is not up to the Court to question the wisdom of the policy. Therefore, approving a settlement in excess of the statutory cap--a cap arrived at through the pull and tug of the legislative dance among stakeholders and legislators--would frustrate the congressional purpose of protecting debt collectors from outcomes that might force them out of business.[7]

---

[6] The Court realizes that other courts within the Third Circuit have approved settlement agreements in FDCPA class actions that provided for a greater payout to the class than the court could permit were the class to prevail at trial. See, e.g., Harlan v. Transworld Sys., Inc., 302 F.R.D. 319, 327 (E.D. Pa. 2014) (approving a $22,200 settlement fund where statutory damages were capped at $5,340, as the defendant's net worth was about $534,000); Oslan v. Law Offices of Mitchell N. Kay, 232 F. Supp. 2d 436, 442 (E.D. Pa. 2002) (approving a $20,000 settlement fund, where statutory damages were capped at $290, as the defendant's net worth was approximately $29,000). However, the issue of whether a court may approve a settlement agreement that provides the class with an amount in excess of the statutory damages cap was not considered, at least not in depth, by these cases.

[7] Arguably, a defendant who voluntarily agrees to a settlement above the statutory cap--such as Defendant in this case--does not believe that it needs protection. Regardless, busting the cap in any one case places all FDCPA debt collector defendants in jeopardy, because plaintiffs in other FDCPA class actions, armed with settlement figures in cases in which the statutory cap was busted, will rely on these cases as a negotiating tool to leverage recovery beyond the cap. Accordingly, a brightline rule banning all payouts above the statutory cap--regardless of whether those payouts are achieved by adjudication or by settlement--is necessary to preserve the congressional goal of limiting the amount of damages debt collectors must pay for violations of the FDCPA.

**III. CONCLUSION**

For the reasons stated above, the Court will deny Plaintiffs' motion for preliminary determination on class certification and preliminary approval of the class settlement.